HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

MICHAEL HALL, and ELIJAH UBER a/k/a
Elijah Hall, and their marital community; and
AMIE GARRAND and CAROL GARRAND
and their marital community,

                    Plaintiffs,

          vs.

BNSF RAILWAY COMPANY, a Delaware
Corporation,

                    Defendant.

No.: 2:13-cv-02160-RSM

**DEFENDANT BNSF RAILWAY
COMPANY'S MOTION TO DISMISS**

NOTE ON MOTION CALENDAR:
May 23, 2014

## I.  INTRODUCTION

Most unionized employees of the Class I freight railroads in the United States – including

defendant BNSF Railway Company ("BNSF") – receive health care benefits through several

collectively-bargained, multi-employer health and welfare plans.  In late 2013, the joint labor

union-management committees that administer those health plans agreed to extend dependent

coverage to same-sex spouses of eligible employees.  More specifically, as of January 1, 2014,

if a railroad employee and his or her same-sex spouse were lawfully married in a state that

recognizes same-sex marriage, the employee and his or her spouse are entitled to the same range of benefits provided to opposite-sex married couples.

Notwithstanding this expansion of coverage, two railroad employees and their respective same-sex spouses are suing BNSF, claiming that they have been unlawfully denied dependent coverage for their same-sex spouses.  BNSF employee Michael Hall and his spouse Elijah Hall – as well as BNSF employee Amie Garrand and her spouse Carol Garrand – contend that BNSF was (and still is) discriminating against them on the basis of sex, in violation of the Equal Pay Act, 29 U.S.C. § 206, and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e.  The plaintiffs also raise claims under the Washington State Law Against Discrimination ("WLAD"), RCW 49.60.030(1), and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*.  Although the plaintiffs acknowledge that the railroad's health care plans now provide coverage for same-sex spouses, they insist that such coverage is not sufficiently "secure," arguing that BNSF is providing such benefits only as a "matter of grace" and not as a "matter of obligation."  *See* First Amended Individual and Collective Complaint [Dkt. No. 8] ¶¶ 92.5 – 92.6.  They also claim that they are entitled to benefits prior to January 1, 2014.  *Id.*  ¶¶ 92.1 – 92.6.

Even if all of the plaintiffs' factual allegations were accepted as true, there is no merit to any of the plaintiffs' claims.  As a matter of law, there is no obligation to provide dependent coverage to employees with same-sex spouses under any of the statutes cited by plaintiffs.[1]  Moreover, to the extent that the plaintiffs are asserting that the plans themselves required such coverage prior to 2014, this Court lacks jurisdiction to interpret the disputed provisions.  Thus,

---

[1]    Plaintiffs reference the Supreme Court's recent decision in *United States v. Windsor*, 133 S. Ct. 2675 (2013).  But that decision overturned the Defense of Marriage Act; it did not establish a new federal law barring discrimination on the basis of sexual orientation.

BNSF moves to dismiss the First Amended Complaint under FRCP 12(b)(1) and FRCP 12(b)(6).  The various legal flaws in plaintiffs' claims are addressed in detail in the Argument section below.  In sum, the main points are as follows:

*First*, plaintiffs lack any viable claim under Title VII because they are alleging discrimination based on sexual orientation, not gender.  *See* Dkt. No 8, ¶¶ 113-118.  The Ninth Circuit – along with many other circuits – has held that "Title VII's prohibition of 'sex' discrimination applies only to discrimination on the basis of gender and should not be judicially extended to include sexual preference such as homosexuality."  *DeSantis v. Pacific T. & T. Co*., 608 F.2d 327, 329-30 (9th Cir. 1979).

*Second*, there is no valid cause of action under the Equal Pay Act ("EPA").  Like Title VII, the EPA prohibits discrimination "on the basis of sex," not on the basis of sexual orientation.  29 U.S.C. § 206(d)(1).  Plaintiffs' EPA claims in this case are grounded on a theory of sexual orientation discrimination because they are comparing homosexual men to heterosexual women (and vice versa), not all men and all women.  *See* Dkt. No 8, ¶¶ 94- 103.  Viewed solely as a question of gender—instead of sexual orientation – the health plans have always treated men and women exactly the same.

*Third*, the plaintiffs' state law discrimination claims are preempted by ERISA.  State fair employment laws are preempted to the extent they seek to regulate or prohibit plan terms that are not unlawful under federal law.  29 U.S.C. § 1144(a); *Shaw v. Delta Air Lines*, 463 U.S. 85, 90 (1983).  Because Congress has not passed federal legislation prohibiting sexual orientation discrimination, provisions of state law that would otherwise require ERISA benefit plans to extend coverage to same-sex spouses are preempted, thereby ensuring that ERISA plans are able to provide and maintain uniform nationwide coverage.

BNSF'S MOTION TO DISMISS  - 3
[Cause No. 2:13-cv-02160-RSM]

**MONTGOMERY SCARP, PLLC**
1218 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 625-1801/Fax (206)625-1807

*Fourth*, plaintiffs' claim under § 502(a) of ERISA raises a disagreement about the proper interpretation of a collectively-bargained health and welfare plan subject to the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*  Federal courts lack jurisdiction to resolve disputes over the interpretation of collectively-bargained terms.  Instead, such questions are subject to mandatory arbitration under § 3 of the RLA unless the railroad's position is "frivolous."  *See, e.g.*, *Coker v. TWA*, 165 F.3d 579 (7th Cir. 1999).  In this case, BNSF's interpretation is and was substantially justified by more than 50 years of consistent application of the plan.

*Finally*, there is no live case or controversy with respect to plaintiffs' claims concerning prospective coverage for same-sex spouses.  They admit that the relevant health care plans now provide the dependent coverage they demand.  *See* Dkt. No 8, ¶  92.1 – 92.6.  While voluntary cessation of challenged conduct does not necessarily render a claim moot, in this case, the railroad participants in the national health care plans cannot revert to the pre-2014 coverage terms without the agreement of the participating labor unions.  *See* 45 U.S.C. § 152 Seventh.  Thus, "it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000).  Accordingly, plaintiffs' demand for prospective relief is moot.

**MONTGOMERY SCARP, PLLC**
1218 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 625-1801/Fax (206)625-1807

## II.  TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II.  TABLE OF CONTENTS ................................................................... 5

III.  FACTUAL BACKGROUND ........................................................... 6

    A.  The Multi-Employer Health Care Plans ............................................. 7

    B.  The Denial of Same-Sex Spousal Coverage Prior to 2014 .................... 7

    C.  The Extension of Coverage in 2014 ................................................... 8

IV.  ARGUMENT ................................................................................. 9

    A.  BNSF Is Not In Violation of Title VII ................................................ 9

    B.  BNSF Is Not In Violation of the Equal Pay Act ................................. 12

    C.  Plaintiffs' State Law Discrimination Claim Is Preempted by ERISA ............... 14

    D.  Any Dispute Over the Meaning of Plan Terms is Subject to RLA
        Arbitration ...................................................................................... 17

        1.  The Intersection of the RLA and ERISA ................................. 17

        2.  Application to Plaintiffs' Interpretation of SPD Terms ........................... 19

    E.  Plaintiffs' Claims for Prospective Relief Are Moot ........................... 21

V.  CONCLUSION ................................................................................. 23

BNSF'S MOTION TO DISMISS  - 5
[Cause No. 2:13-cv-02160-RSM]

**MONTGOMERY SCARP, PLLC**
1218 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 625-1801/Fax (206)625-1807

### III. FACTUAL BACKGROUND

It is well-settled that when considering a motion to dismiss pursuant to Rule 12(b)(1), the Court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve any factual disputes concerning the existence of jurisdiction. *E.g.*, *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1941).  In this case, BNSF relies on both the allegations in the First Amended Complaint and the jurisdictional facts set forth in the accompanying Declaration of A. Kenneth Gradia ("Gradia Dec.") (Attachment A).

Moreover, under Rule 12(b)(6), a court may consider, in addition to the allegations of the complaint, any "documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). [2]  Hence, in this case, BNSF also relies on the documents attached to or referenced in plaintiffs' First Amended Complaint, including the Summary Plan Description ("SPD").  *See* Dkt. No 8, ¶¶ 41, 64 & Ex. A.   For purposes of this motion, BNSF assumes the facts as alleged in the Amended Complaint are true.  The Court is not, however, obligated to accept as true any legal conclusions, speculation, or entirely implausible allegations.  *See, e.g., Bell v. Twombley*, 550 U.S. 544, 555 (2007).

---

[2]      A document is incorporated by reference if the complaint specifically refers to the document and if its authenticity is not questioned.  *Townsend v. Columbia Operations*, 667 F.2d 844, 848-49 (9th Cir. 1982).  Such a document (even if "not physically attached to the pleading") may be considered in ruling on a Rule 12(b)(6) motion to dismiss.  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *see also* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1327, at 762-63 (2d ed. 1990) ("when [the] plaintiff fails to introduce a pertinent document as part of his pleading, [the] defendant may introduce the exhibit as part of his motion attacking the pleading.").  The Ninth Circuit has applied this rule to an ERISA case involving an insurance plan.  *See Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998) ("Because Parrino's claims rest on his membership in FHP's plan and on the terms of the plan, documents governing plan membership, coverage, and administration are essential to his complaint.").

BNSF'S MOTION TO DISMISS  - 6
[Cause No. 2:13-cv-02160-RSM]

**MONTGOMERY SCARP, PLLC**
1218 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 625-1801/Fax (206)625-1807

**A.      The Multi-Employer Health Care Plans.**

BNSF provides health care benefits to its unionized employees.  Dkt. No 8, ¶ 22; Gradia Dec. ¶  4.  These benefits include dependent coverage for eligible employees' spouses.  Dkt. No 8, ¶ 22; Gradia Dec. ¶ 12.  Plan benefits are administered by United HealthCare, a third party vendor that handles day-to-day coverage questions.  Dkt. No 8, ¶ 32.  Plan benefits, including the terms relating to dependent coverage, are described in a SPD.  Dkt. No 8, Ex. A; Gradia Dec. ¶¶ 7-9.

The health care plans that provide coverage for the vast majority of unionized railroad employees, including employees of BNSF, are collectively bargained on a multi-employer basis. Gradia Dec. ¶¶ 2-4.  More specifically, BNSF's health care plans are established and maintained pursuant to a number of "national" collective bargaining agreements with the railroad unions.  *Id.* ¶ 9 & Exs. 1-4.  These plans include The Railroad Employees National Health and Welfare Plan (the "National Plan") and the National Railway Carriers and United Transportation Union Health and Welfare Plan (the "NRC/UTU Plan").  *Id.* ¶ 5 & Exs. 1-4.  The Plan Documents for both Plans incorporate their respective SPDs.  *Id.*

**B.      The Denial of Same-Sex Spousal Coverage Prior to 2014.**

Health care coverage for employee spouses was added to the national railroad health care plans in 1956.  *See* Gradia Dec. ¶ 12 & Exs. 7-8.  Under the terms adopted at that time, coverage was provided to an employee's "husband" or "wife."  *Id.*  At the time, the only lawful marriages were opposite-sex, and so the intent of the parties was to provide coverage only to opposite-sex spouses of railroad employees.  *Id.*  This interpretation of the Plans' dependent coverage was maintained for more than 50 years.  *Id.*

**MONTGOMERY SCARP, PLLC**
1218 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 625-1801/Fax (206)625-1807

In 2013, BNSF employee Michael Hall married Elijah Hall, and soon thereafter the couple sought spousal coverage under one of the National Plans.  Dkt. No 8, ¶¶ 23-24, 31.  BNSF employee Amie Garrand married Carol Garrand in 2013.  Dkt. No 8, ¶ 74.  She also sought coverage for her same-sex spouse.  *Id.*  Both Mr. Hall and Ms. Garrand were repeatedly told that the Plans did not provide any dependent coverage for same-sex spouses.  *Id.* ¶¶ 31-40, 74-89.

**C.      The Extension of Coverage in 2014**

In October, 2013, the railroad members of the Joint Plan Committee of the National Plan and the Governing Committee of the NRC/UTU Plan bargained with the labor members of those committees over the issue of dependent coverage for same-sex spouses.  *See* Gradia Dec. ¶¶ 16-17.  Those negotiations resulted in an agreement to extend coverage to lawful same-sex spouses, effective January 1, 2014.  *Id.*  In agreeing to extend coverage, BNSF and the other railroads maintained that they were under no legal obligation to do so, but rather were extending the coverage voluntarily.  *See* Dkt. No 8, ¶ 92.5; Gradia Dec. Ex. 11.  However, once the railroads and unions agreed to the change, BNSF and the other railroads were prohibited from unilaterally rescinding or changing such coverage.  *See* Gradia Dec. ¶ 19.

On December 23, 2013, BNSF employees – including Mr. Hall and Ms. Garrand – were notified that the National Plan and the NRC/UTU Plan would begin providing dependent coverage to lawful same-sex spouses.  *See* Dkt. No 8, ¶ 92.1; Gradia Dec. ¶ 17 & Exs. 11-13.  The plaintiffs admit that, effective January 1, 2014, they began receiving health care benefits for their same-sex spouses.  *See* Dkt. No 8, ¶¶ 92.2, 92.5.  They have not, however, received retroactive benefits for the period dating from when each of the two couples were married in 2013 through January 1, 2014.  *Id.* ¶ 92.5.

BNSF'S MOTION TO DISMISS  - 8
[Cause No. 2:13-cv-02160-RSM]

**MONTGOMERY SCARP, PLLC**
1218 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 625-1801/Fax (206)625-1807

# IV.  ARGUMENT

The First Amended Complaint should be dismissed under FRCP 12(b)(6) and/or FRCP Rule 12(b)(1).  In Subpart A, below, BNSF demonstrates that plaintiffs have failed to state a claim under Title VII.  In Subpart B, BNSF addresses their claim under the Equal Pay Act.  In Subpart C, BNSF explains that plaintiffs' state law claim is preempted.  In Subpart D, BNSF shows that the Court lacks jurisdiction over plaintiffs' § 502 ERISA claim.  Finally, in Subpart E, BNSF demonstrates that plaintiffs' claims for prospective relief are moot.

## A.    BNSF Is Not In Violation of Title VII.

Title VII forbids an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. §2000e-2(a)(1). The statutory text makes no mention of sexual orientation – as distinguished from gender – and so the most natural reading is that disparate treatment on the basis of sexual orientation is not prohibited by Title VII.  *DeSantis v. Pacific Telephone & Telegraph Co.*, 608 F.2d 327, 329 (9th Cir. 1979) (citing *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659, 662-63 (9th Cir. 1977)).  This "plain meaning" interpretation of the text, *DeSantis*, 608 F.2d at 329, is confirmed by the fact that "Congress has repeatedly rejected legislation that would have extended Title VII to cover sexual orientation." *Bibby v. Philadelphia Coca Cola Bottling Co.*, 260 F.3d 257, 261 (3d Cir. 2001) (citing, as examples, Employment Nondiscrimination Act of 1996, S.2056, 104th Cong. (1996); Employment Non Discrimination Act of 1995, H.R. 1863, 104th Cong. (1995); Employment Non-Discrimination Act of 1994, H.R. 4636, 103d Cong. (1994)). When Congress repeatedly rejects a proposal to alter a statute's meaning, courts should not attempt to achieve the rejected result through creative interpretation. *See, e.g.*, *Runyon v. McCrary*, 427 U.S. 160, 173-74 (1976).

BNSF'S MOTION TO DISMISS  - 9
[Cause No. 2:13-cv-02160-RSM]

MONTGOMERY SCARP, PLLC
1218 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 625-1801/Fax (206)625-1807

Given the text and history of Title VII, it is no surprise that the Ninth Circuit has held that the "prohibition of 'sex' discrimination applies only to discrimination on the basis of gender," not sexual orientation.  *DeSantis*, 608 F.2d at 329-30; *see also, e.g., Rene v. MGM Grand Hotel, Inc.,* 305 F.3d 1061, 1063 (9th Cir. 2002) ("sexual orientation is irrelevant for purposes of Title VII").   Indeed, the "federal courts of appeal have repeatedly held that Congress did not intend that the term 'sex' include sexual orientation."  Human Rights Campaign, *The State of the Workplace for Lesbian, Gay, Bisexual and Transgender Americans 2007–08*, at 2 (Feb. 20, 2009).[3]  It is well-settled, in short, that the "manifest purpose of Title VII's prohibition against sex discrimination in employment is to ensure that ***men and women*** are treated equally." *Holloway*, 566 F.2d at 622–23 (emphasis added).

In this case, the Halls and Garrands have not alleged any discrimination on the basis of sex, as opposed to sexual orientation.  That is, they have not alleged that BNSF's benefit plan treated its male employees differently than female employees. Indeed, the plaintiffs acknowledge that BNSF's plan paid "spousal health coverage where a male employee [was] married to a female spouse" on the same terms that it paid coverage "where a female employee [was] married to a male spouse."  Dkt. No 8, ¶ 22.  Rather, the plaintiffs allege that BNSF's former policy treated employees differently depending on their ***sexual orientation***:  *i.e.,* that the company's denial of benefits for same-sex spouses reflected a belief that "marriage is between one man and one woman."  *Id.* ¶ 36.  But Title VII does not provide a cause of action to redress that form of disparate treatment.

---

[3]      *See, e.g.*, *Bibby*, 260 F.3d at 260–61; *Simonton v. Runyon,* 232 F.3d 33, 35 (2d Cir. 2000); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259 (1st Cir. 1999); *Wrightson v. Pizza Hut of America, Inc.*, 99 F.3d 138, 143 (4th Cir. 1996); *Williamson v. A.G. Edwards & Sons, Inc.*, 876 F.2d 69, 70 (8th Cir. 1989).

**MONTGOMERY SCARP, PLLC**
1218 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 625-1801/Fax (206)625-1807

To be sure, plaintiffs try to couch their argument in gender terms, asserting that (for example) Mr. Hall is male, did not receive the benefit, and would have received the benefit if he were female.  *See* Dkt. No 8, ¶ 114.  Thus, they say, the discrimination must be "because of . . . sex."  *Id.*  But that argument depends on an obvious logical fallacy.  In asserting their theory of discrimination, plaintiffs are not comparing all men and all women.  Rather, they are comparing only ***homosexual*** men to ***heterosexual*** women (and vice versa).  In other words, their argument necessarily requires looking to sexual orientation in order to find any disparate treatment at all.  Accordingly, their claim is, at bottom, really just about sexual orientation discrimination, which is not, as a matter of law, actionable under Title VII.

Plaintiffs also assert, in passing, that BNSF violated Title VII because the lack of benefits for same-sex spouses was "based on gender nonconforming conduct."  Dkt. No 8, ¶ 114.  They appear to be alluding to the line of authority holding that discrimination based on the employee's non-conformity with sex stereotypes is a viable theory of sex discrimination.  *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989); *cf. also Rene*, 305 F.3d, at 1063 (addressing same-sex harassment).  In *Hopkins*, for example, the plaintiff was advised by her employer to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry."  490 U.S. at 235.  Here, by contrast, the plaintiffs do not allege any acts of gender stereotyping.  There is no allegation that, for example, BNSF has "object[ed] to aggressiveness" (or any other personality trait) "in women" but not in men, or vice-versa.  *Id.* at 251.  Compare *Nichols v. Azteca Restaurant Enterprises*, 256 F.3d 864, 874 (9th Cir. 2001) ("systematic abuse" because of belief that plaintiff "did not act as a man should act" was discrimination on the basis of sex).  Rather, once again, the only disparate treatment alleged in this case is solely on the basis of sexual orientation.

**MONTGOMERY SCARP, PLLC**
1218 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 625-1801/Fax (206)625-1807

**B.     BNSF Is Not In Violation of the Equal Pay Act.**

The statutory language of the Equal Pay Act is very similar to the language of Title VII. As noted above, Title VII prohibits discrimination "because of . . . sex," 42 U.S.C. §2000e-2(a)(1), whereas the Equal Pay Act forbids discrimination in compensation "on the basis of sex."  29 U.S.C. § 206(d)(1).[4]  Thus, both statutes use the same term – "sex" – to define the category of prohibited discrimination.  It follows that "any violation of the Equal Pay Act is also a violation of Title VII," though Title VII also "covers types of wage discrimination not actionable" under the Equal Pay Act. 29 C.F.R. §1620.27(a) ("Relationship to the Equal Pay Act of title VII of the Civil Rights Act").  In other words, the Equal Pay Act's substantive protections are a subset of Title VII's, and as to sex discrimination, they are coextensive. *See DeCintio v. Westchester County Medical Center*, 807 F.2d 304, 308 (2d Cir. 1986) ("We perceive no valid justification for defining 'sex' for Equal Pay Act purposes in a manner inconsistent with the word's meaning under Title VII.").   Accordingly, for the same reasons that the Court should dismiss plaintiffs' Title VII claim, *see supra* pp. 7 - 9, it should also dismiss their Equal Pay Act claim.  *Cf. Foray v. Bell Atlantic*, 56 F. Supp. 2d 327, 330 (S.D.N.Y. 1999) (in rejecting challenge to employer policy providing benefits to same-sex unmarried couples but not opposite-sex unmarried couples, plaintiff's Equal Pay Act claim "is deficient" for the same reasons it fails under Title VII).

---

[4]     The full text of § 206(d)(1) is as follows:  "No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex:  Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee."

Moreover, even if the Equal Pay Act is considered in isolation, without regard to the case law under Title VII, plaintiffs still cannot sustain a claim. The text of § 206(d) calls for a court to inquire into whether the "wages [of] employees" are "less than the rate" that is paid to "employees of the opposite sex." 29 U.S.C. § 206(d)(1). The statute's aim is to ensure that "women receive equal pay for equal work." *Gunther v. Washington County*, 623 F.2d 1303, 1309 (9th Cir. 1979). Thus, the critical comparison is the compensation of men versus the compensation of women. *See Hein v. Or. Coll. of Educ.*, 718 F.2d 910, 913 (9th Cir. 1983) ("To make out a case under the Equal Pay Act, a plaintiff must prove that an employer is paying different wages to employees of the opposite sex for equal work.").

Here again, plaintiffs fail to allege any disparate treatment in compensation as between men and women employed by BNSF, *i.e.*, between employees of "opposite sex." To the contrary, plaintiffs openly admit that, during the period of time at issue, women received dependent coverage only for opposite-sex spouses, and that men likewise received dependent coverage only for opposite-sex spouses. *See* Dkt. No 8, ¶¶ 22, 27, 91, 100. That is, by definition, equal compensation for men and women – neither gender was treated more favorably than the other in terms of spousal benefits.

In the end, plaintiffs' argument under the Equal Pay Act – just as with Title VII – turns on sexual orientation. Plaintiffs are arguing that homosexual men were compensated less than heterosexual women, and homosexual women were compensated less than heterosexual men. *See* Dkt. No 8, ¶¶ 100. The question of sexual orientation is intrinsic to and cannot be disentangled from their theory of disparate treatment. But whether a straight man and a gay woman (or vice versa) receive the same compensation is not what the Equal Pay Act asks or requires. Thus, the claim under the Equal Pay Act should be dismissed.

BNSF'S MOTION TO DISMISS  - 13
[Cause No. 2:13-cv-02160-RSM]

**MONTGOMERY SCARP, PLLC**
1218 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 625-1801/Fax (206)625-1807

**C.    Plaintiffs' State Law Discrimination Claim Is Preempted by ERISA.**

The Halls and Garrands also contend that the lack of same-sex spousal benefits under the Plans, prior to January 1, 2014, violates Washington state law.  They point to the provisions of RCW 49.60.030(1), which bars employment discrimination on the basis of sexual orientation, and RCW 49.60.180(3), which prohibits discrimination "in compensation" because of, *inter alia*, sexual orientation.  *See* Dkt. No 8, ¶¶ 120-22 (citing WLAD).   Thus, according to plaintiffs, if an ERISA benefit plan provides spousal coverage, Washington state law requires the plan to offer such coverage to same-sex spouses as well as opposite-sex spouses, even if such coverage is not required by federal law.  *Id.*

That is not so.  One of the purposes of Congress in enacting ERISA was to promote nationwide uniformity and consistency in the administration of employee benefit plans by "eliminating the threat of conflicting and inconsistent State and local regulation."  *Shaw*, 463 U.S. at 99 (quoting 120 Cong. Rec. 29197 (1974) (remarks of Rep. Dent)).  To that end, ERISA includes "one of the broadest preemption clauses ever enacted by Congress."  *PM Group Life Ins. v. Western Growers Assur. Trust*, 953 F.2d 543, 545 (9th Cir. 1992) (quoting *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1439 (9th Cir. 1990)).  Section 514(a) provides that ERISA shall "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." 29 U.S.C. § 1144(a).[5]

---

[5]    An "employee benefit plan" includes any "employee welfare benefit plan."  29 U.S.C. § 1002(2)(B)(3).  An "employee welfare benefit plan" is "any plan, fund, or program . . . established or maintained by an employer or by an employee organization, or by both, . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).  29 U.S.C. § 1002(1).

BNSF'S MOTION TO DISMISS  - 14
[Cause No. 2:13-cv-02160-RSM]

**MONTGOMERY SCARP, PLLC**
1218 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 625-1801/Fax (206)625-1807

In *Shaw*, the Supreme Court applied this broad ERISA preemption language to a claim arising under a state employment antidiscrimination law.  463 U.S. at 88.  The case concerned a group of employee health plans that lacked benefits for pregnant workers.  *Id.* at 92.  At the time – this was prior to the Pregnancy Discrimination Act – federal law did not prohibit pregnancy discrimination.  *Id.* at 88-89.  When a New York state court ruled that the plans' failure to offer pregnancy benefits violated the New York Human Rights Law, the plan sponsors argued that the state law was preempted by ERISA because the state was attempting to impose benefit standards beyond what was required by federal law.  *Id.*

The Supreme Court held that the state antidiscrimination law was preempted to the extent that it sought to prohibit conduct that is not illegal under Title VII.  *Id.* at 103, 105-06.  The Court began by confirming that a state antidiscrimination law necessarily "relates to" an ERISA plan where, as applied, the state law would mandate benefits for a particular group.  *Id.* at 97; *see also id.* at 98-100 (explaining reasons for an expansive reading of § 514(a)).  The Court then went on to consider whether preemption would interfere in the operation of federal law – in particular Title VII – contrary to § 514(d) of ERISA. [6]  It noted that state fair employment laws are important to Title VII's enforcement scheme, and thus cannot be preempted across-the-board.  *Id.* at 102.  However, the Court held, this concern does ***not*** extend to state laws that "prohibit employment practices that are lawful under Title VII."  *Id.* at 103.  Thus, the Court concluded, the ERISA preemption analysis for a state antidiscrimination law turns on "whether employment practices [that] are unlawful under a broad state law . . . are prohibited by Title VII. If they are not, the state law will be superseded . . . ."  *Id.* at 105-06.

---

[6]     Section 514(d) provides that "[n]othing in this title (subchapter) shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States . . ."

As applied here, the *Shaw* analysis demonstrates that plaintiffs' WLAD claim is preempted by ERISA.  First, it is unconverted that the railroads' health and welfare plans are "employee benefit plans" within the meaning of ERISA.  *See* Dkt. No 8, ¶¶ 126 (acknowledging that the plan is  "separate legal entity" under 29 U.S.C.§ 1132(d)(1), which concerns "employee benefit plans").  *See also, e.g.*, Gradia Ex. 4 at 176-82.  Second, the WLAD antidiscrimination law "relates to" an ERISA plan in exactly the same way that the New York Human Rights Law related to ERISA in *Shaw*.  As interpreted by plaintiffs, the WLAD "prohibits employers from structuring their employee benefit plans in a manner that discriminates on the basis of" sexual orientation. *Shaw*, 463 U.S. at 97.  By definition, that "has a connection with or reference to" an ERISA plan.  *Id.*

Third, and perhaps most importantly, the WLAD, as interpreted by plaintiffs, "prohibits practices that are lawful under federal law." *Id.* at 108.  As discussed in detail above, Title VII and the Equal Pay Act do not prohibit discrimination on the basis of sexual orientation.  *See supra* pp. 9 - 11.  The WLAD's prohibition of discrimination on the basis of "sexual orientation" is, therefore, almost exactly analogous to the New York state law's prohibition of pregnancy discrimination in *Shaw*.  In both cases, the state law prohibits practices that are or were not yet illegal under federal law.  *See Hurlic v. Southern California Gas Opinion Co.*, 539 F.3d 1024, 1037 (9th Cir. 2008) (holding that state law age discrimination claim was preempted by ERISA because the state law purported to prohibit conduct that "would be lawful under the ADEA").   Thus, preemption of WLAD on this point does not pose any risk of interfering with the enforcement of Title VII or other federal law.  As such, plaintiffs' state law claims are preempted under § 514(a) of ERISA.

**MONTGOMERY SCARP, PLLC**
1218 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 625-1801/Fax (206)625-1807

**D.      Any Dispute Over the Meaning of Plan Terms is Subject to RLA Arbitration.**

The Fifth Count in the First Amended Complaint asserts a claim under § 502(a) of

ERISA, arguing that BNSF "violated the terms of the plan" when it denied coverage to same-

sex spouses.  *See* Dkt. No 8, ¶ 125; *see also id.* ¶¶ 124-131.  The plaintiffs point to the language

in the NRC/UTU Plan's SPD, which states that "Eligible Dependents" include "[y]our wife or

husband." Dkt. No 8, ¶ 125; *see also* Dkt. No 8, Ex. A, ¶¶ 64-65, 90, 92.  Plaintiffs argue that

the refusal to cover same-sex spouses (prior to 2014) is contrary to the "plain meaning" of this

provision. *Id.* ¶ 65.  They conclude that the refusal to offer same-sex spousal benefits "violates

ERISA." *Id.* ¶ 125.

**1.      The Intersection of the RLA and ERISA.**

This Court lacks jurisdiction to decide that claim.  It is well-settled that arbitration boards

under § 3 of the RLA have "mandatory, exclusive, and comprehensive" jurisdiction to resolve

disputes over the "interpretation and application" of collective bargaining agreements between

railroads and their employees (*i.e.*, "minor disputes").  *Brotherhood of Locomotive Engineers v.*

*Louisville & Nashville R.R.*, 373 U.S. 33, 38 (1963) (quoting 45 U.S.C. §  153 First (i)). As the

Ninth Circuit has explained, this means that "[n]o federal or state court has jurisdiction over the

merits of any employment dispute subject to determination by an [RLA] system board of

adjustment." *Long v. Flying Tiger Line, Inc.*, 994 F.2d 692, 693 (9th Cir. 1993).  Under the

standard established by the Supreme Court in *Consolidated Rail Corp. v. RLEA*, 491 U.S. 299,

304-05 (1989) ("*Conrail*"), when a carrier asserts that a dispute is "minor," a court must defer to

arbitration unless the carrier's proffered interpretation of the disputed terms is "not arguably

justified" or is "frivolous."  *Id.*

**MONTGOMERY SCARP, PLLC**
1218 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 625-1801/Fax (206)625-1807

These rules apply with equal force when an employee asserts a claim under § 502(a) of ERISA to challenge a carrier's interpretation of a collectively-bargained health and welfare plan or pension plan.  The first case to address the interplay between ERISA and the RLA was *ALPA v. Northwest Airlines, Inc.*, 627 F.2d 272 (D.C. Cir. 1980).  The union in *Northwest* challenged an airline's interpretation of a collectively-bargained pension plan, and argued that such a dispute could be heard in federal court, citing § 502(e) of ERISA.  *Id.* at 274-75.  The court noted, however, that it is "indisputable" that under the RLA, interpretation of collectively-bargained terms must be submitted to arbitration.  *Id.* at 275.  Congress was "very clear," the court held, that this obligation was not modified or overridden by ERISA.  *Id.* (citing 29 U.S.C. § 1144(d)).  Thus, the court concluded, so long as an ERISA claim implicates interpretation of collectively-bargained language – as opposed to an independent statutory claim – the question must be sent to arbitration.  *Id.* at 278.

The *Northwest* court's reasoning was adopted by the Ninth Circuit in *Long v. Flying Tiger*, 994 F.2d at 694.  Indeed, every other circuit that has considered the issue has reached the same conclusion:  a district court lacks jurisdiction over any dispute involving the interpretation of a collectively-bargained pension or medical benefit plan.  *See, e.g.*, *Oakey v. US Airways Pilots Disability Income Plan*, 723 F.3d 227, 232-34 (D.C. Cir. 2013); *Ballew v. Cont'l Airlines*, 668 F.3d 777, 782-87 (5th Cir. 2012); *Stephens v. Ret. Income Plan for Pilots of U.S. Air*, 464 F.3d 606, 613-14 (6th Cir. 2006); *Bloemer v. Northwest Airlines*, 401 F.3d 935, 937 (8th Cir. 2005); *Coker v. Trans World Airlines*, 165 F.3d 579, 583-84 (7th Cir. 1999); *ALPA v. Delta Air Lines*, 863 F.2d 87 (D.C. Cir. 1988); *Bowe v. Northwest Airlines*, 974 F.2d 101, 103 (8th Cir. 1992); *Loveless v. Eastern Air Lines*, 681 F.2d 1272, 1275 (11th Cir. 1982); *de la Rosa Sanchez v. Eastern Airlines*, 574 F.2d 29, 31-33 (1st Cir. 1978).

BNSF'S MOTION TO DISMISS  - 18
[Cause No. 2:13-cv-02160-RSM]

**MONTGOMERY SCARP, PLLC**
1218 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 625-1801/Fax (206)625-1807

### 2.      Application to Plaintiffs' Interpretation of SPD Terms.

In this case, it is obvious that the plaintiffs' § 502 claim concerns the interpretation of collectively-bargained plan terms.  The only issue in this count of the Amended Complaint is the meaning of the "eligible dependent" language in the SPD, and in particular the meaning of "husband" and "wife."  *See* Dkt. No 8, ¶ 125.  This is language that was collectively bargained by the railroads and the unions when they first agreed to provide dependent health care coverage.  *See* Gradia Dec. ¶ 12.  Thus, an RLA arbitrator has exclusive jurisdiction to decide what the parties actually intended when they drafted that language.

Indeed, even if plaintiffs deny that the SPD language is part of a collective bargaining agreement, they still cannot establish jurisdiction.  This issue was addressed in *Pearson v. Northwest Airlines*, 659 F. Supp. 2d 1084 (C.D. Ca. 2009).  In that case, the plaintiff argued that her ERISA claim was based on an "external" plan document, not a CBA.  *Id.* at 1091.  The court explained that even if the plan itself is not a CBA, the dispute would still be "minor dispute" subject to arbitration so long as the plan is "maintained pursuant to a CBA," which means that the plan is "incorporated by reference" in the CBA  *Id.*  To determine whether a plan is "incorporated by reference," a court should examine (1) whether the CBA sets forth material amendments to or elements of the plan; (2) whether the plan referenced the CBA; and (3) whether the parties to the CBA had bargained for the plan.  *Id.*

Here, every element of that test favors BNSF's position.  First, the most recent CBAs set forth a number of material modifications to the plans.  *See* Gradia Ex. 5 at 6-13; Gradia Ex. 6 at 7-14.  Second, the plans themselves refer to the agreements, explaining that they are established and maintained "pursuant to" those agreements.  *See* Gradia Ex. 1 at 1 (National Plan); Gradia Ex. 2 at 1, 183 (National Plan SPD); Gradia Ex. 3 at 1 (NRC/UTU Plan); Gradia Ex. 4 at 1, 176

BNSF'S MOTION TO DISMISS  - 19
[Cause No. 2:13-cv-02160-RSM]

MONTGOMERY SCARP, PLLC
1218 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 625-1801/Fax (206)625-1807

(NRC/UTU Plan SPD).   Third, the evidence is quite clear that the railroads and unions bargained for these plans.  Indeed, the CBAs themselves expressly state that the plans "will be continued" by operation of the agreements.  *See* Gradia Ex. 5 at 6; Gradia Ex. 6 at 7; *see also* Gradia Dec. ¶ 4 (explaining that the parties collectively bargain over the health plans).

The *Pearson* court also examined whether the "source of rights" claimed by the employee was "independent" of the CBA.  659 F. Supp. 2d at 1092-93.  As noted above, RLA arbitration is not required when a party asserts an independent *statutory* right under ERISA, such as "interference" with vested benefits under § 510 or a breach of fiduciary obligations. *Long*, 994 F.2d at 695.  Here, by contrast, the only source of the rights asserted by plaintiffs are, as they themselves allege, "the terms of the plan."  *See* Dkt. No 8, ¶ 125.  They are not claiming some independent ERISA violation, such as a failure to provide required notice or a breach of fiduciary duty.   Whether plaintiffs are entitled to benefits under § 502 turns solely on interpretation of the SPD terms "husband" and "wife," as used in the context of the plan.  *See* *Pearson*, 659 F. Supp. 2d at 1093 (finding that collectively-bargained plan is the source of rights claimed by employee).

Finally, BNSF's position that the plan terms "husband" and "wife"  – prior to 2014 – referred to only opposite-sex spouses is hardly "frivolous."  As Mr. Gradia explains, the origin of those terms dates back to 1956, long before same-sex spouses were lawful.  *See* Gradia Dec. ¶ 12 & Exs. 7-8.  The unions never objected to the railroads' position that the plan covered only opposite-gender spouses, and the parties therefore at least arguably had an implied agreement on this point.  *Id.* ¶ 13.  Moreover, BNSF's pre-2014 interpretation is supported by then-extant federal law.  *Id.* ¶ 15.  Because BNSF's position is at least "arguable," only an arbitrator could decide the meaning of the disputed terms.  *See* *Conrail*, 491 U.S. at 305.

BNSF'S MOTION TO DISMISS  - 20
[Cause No. 2:13-cv-02160-RSM]

**MONTGOMERY SCARP, PLLC**
1218 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 625-1801/Fax (206)625-1807

**E.      Plaintiffs' Claims for Prospective Relief Are Moot.**

"A case becomes moot – and therefore no longer a "Case" or "Controversy" for purposes of Article III [of the U.S. Constitution] – 'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'"  *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013) (quoting *Murphy v. Hunt*, 455 U. S. 478, 481 (1982) (per curiam)).  "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute 'is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.'"  *Id.* (quoting *Alvarez v. Smith*, 558 U. S. 87, 92, (2009)); *see also*, *e.g.*, *Rosebrock v. Mathis*, 2014 U.S. App. LEXIS 4890 at *29 (9th Cir., March 14, 2014) (finding case to be moot).

To be sure, a "defendant's voluntary cessation of a challenged practice" will not usually deprive a federal court of "its power to determine the legality of the practice."  *City of Mesquite v. Aladdin's Castle*, 455 U.S. 283, 289 (1982).  The concern underlying this rule is that "a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off."  *Already*, 133 S. Ct. at 727.   Thus, although a party may show mootness by pointing to a "voluntary cessation," the party asserting mootness has the burden to show that "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth*, 528 U. S. at 189-90.  Once it is "absolutely clear" that challenged conduct cannot "reasonably be expected to recur," *id.* at 190, the fact that some individuals may still assert "conjectural or hypothetical" speculation about potential future developments does not give rise to the sort of "concrete" and "actual" injury necessary to establish Article III standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, (1992).

**MONTGOMERY SCARP, PLLC**
1218 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 625-1801/Fax (206)625-1807

In applying this standard, both the Supreme Court and the Ninth Circuit have found mootness as a result of voluntary cessation whenever there are specific facts – beyond just the defendant's non-binding assurances – to indicate that the defendant could not restart the challenged conduct even if it wanted to do so.  For example, where the defendant has entered into a binding agreement to change or cease the disputed conduct, courts will typically conclude that any continuing dispute over the conduct is moot.  *See, e.g.*, *Already*, 133 S. Ct. at 728 (counterclaim defendant entered into covenant not to sue that mooted the case); *Western Radio Services Co. v. CenturyTel*, 497 F. App'x 700, 701 (9th Cir. 2012) (because defendant had entered into "agreement [that] is binding and does not expire," there is no reasonable expectation that alleged violation will reoccur); *Students for a Conservative America v. Greenwood*, 2004 U.S. App. LEXIS 25255, at *5 (9th Cir. Aug. 11, 2004) (defendants entered into agreement in which they committed not to reenact challenged rules).[7]

Here, it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth*, 528 U. S. at 189-90.  It is undisputed that the relevant health and welfare plans have been changed and now do provide the same-sex coverage that plaintiffs demand.  *See* Dkt. No 8, ¶ 92.5.  Moreover, those changes were made through collective bargaining with the unions that represent the railroads' employees.  *See* Gradia Dec. ¶¶ 16-17.  Under the RLA, the railroads are now bound by those agreements – they are prohibited from unilaterally changing the coverage except through the collective bargaining processes prescribed by the Act.  *Id.* ¶ 19; *see also* 45 U.S.C.§ 152 Seventh.

---

[7]     Mootness may arise on the basis of voluntary cessation even where the defendant continues to insist that its past conduct was perfectly lawful.  *Smith v. University of Washington Law School*, 233 F.3d 1188, 1195 (9th Cir. 2000).  This is because mere statements of innocence with respect to past behavior do not, standing alone, suggest that the defendant is prepared to reassert the challenged conduct in the face of new barriers to doing so.  *Id.*

**MONTGOMERY SCARP, PLLC**
1218 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 625-1801/Fax (206)625-1807

This is not, therefore, a situation where BNSF is simply representing – in a vague or unenforceable way – that it intends to maintain same-sex coverage in the future.  Just as in cases like *Already* or *Western Radio Services*, there are extrinsic facts confirming BNSF would be **unable** to change the plans back to the way they were, even if it were inclined to do so.  As a result, it is absolutely clear that the plaintiffs' claims – to the extent they seek prospective relief – are moot.   *See* Dkt. No 8, at 29.  There is no basis for an injunction or declaratory judgment requiring BNSF to do something that it is already obligated to do under the applicable collective bargaining agreements and the RLA.

## V.  CONCLUSION

For the foregoing reasons, the First Amended Complaint should be dismissed under Federal Rule 12(b)(1) and Federal Rule 12(b)(6).

DATED this 30th day of April, 2014.

**MONTGOMERY SCARP, PLLC**

____s/ Jeremy Rogers_____

Jeremy Rogers, WSBA No. 36292
1218 Third Avenue, Suite 2700
Seattle, WA 98101
Telephone: (206) 625-1801
Facsimile: (206) 625-1807
E-mail: jeremy@montgomeryscarp.com

**Attorneys for Defendant BNSF**

**JONES DAY**

____s/ Donald J. Munro_____

Donald J. Munro (admitted *pro hac vice*)
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
E-mail: dmunro@jonesday.com

**Attorneys for Defendant BNSF**

BNSF'S MOTION TO DISMISS  - 23
[Cause No. 2:13-cv-02160-RSM]

**MONTGOMERY SCARP, PLLC**
1218 Third Avenue, Suite 2700
Seattle, Washington 98101
(206) 625-1801/Fax (206)625-1807

## CERTIFICATE OF SERVICE

I hereby certify that true and complete copies of **Defendant BNSF's Motion to Dismiss**, **Declaration of A. Kenneth Gradia with Exhibit s1-13**, and **[Proposed] Order Granting Defendant BNSF's Motion to Dismiss** have been filed with the United States District Court via the ECF system which gives automatic notification to the following interested parties:

Cleveland Stockmeyer
Cleveland Stockmeyer, PLLC
8056 Sunnyside Avenue North
Seattle, Washington 98103
Telephone: (206) 419-4385
E-mail:cleve@clevelandstockmeyer.com
**Attorneys for Plaintiffs**

Duncan C. Turner
Badgley Mullins Turner, PLLC
701 Fifth Avenue, Suite 4750
Seattle, Washington 98104
Telephone: (206) 621-6566
E-mail: duncanturner@badgleymullins.com
**Attorneys for Plaintiffs**

DATED this 30th day of April, 2014, at Seattle, Washington.

s/ Kaitlyn Donahoe
Kaitlyn Donahoe, Paralegal