IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICHAEL HALL, and ELIJAH UBER, a/k/a Elijah Hall, and their marital community; and AMIE GARRAND and CAROL GARRAND and their marital community,<br><br>　　　　　　　　Plaintiffs,<br><br>　v.<br><br>BNSF RAILWAY COMPANY,<br><br>　　　　　　　　Defendant. | Case No. 2:13-cv-02160-RSM |

## DECLARATION OF A. KENNETH GRADIA

A. Kenneth Gradia states as follows:

1.  I am the Chairman of the National Carriers' Conference Committee ("NCCC"), which represents a number of freight railroads, including BNSF Railway, Inc. ("BNSF"), in multi-employer collective bargaining with the 13 different rail unions that represent the railroads' employees. As Chairman of the NCCC, I also serve as the Co-Chair of the Joint Plan Committee of The Railroad Employees National Health and Welfare Plan, and as the Co-Chair of the Governing Committee of the National Railway Carriers and United Transportation Union Health and Welfare Plan. I make this declaration on the basis of personal knowledge and on the basis of documents that the NCCC maintains in the regular course of business.

2.  In the freight railroad industry, pursuant to the Railway Labor Act ("RLA"), all matters relating to "rates of pay, rules, and working conditions" are collectively bargained between the railroads and the unions that represent their employees. *See* 45 U.S.C. § 156.

Collective bargaining in the railroad industry is a complex process. Railroads and unions may bargain on a "local" basis, which generally means that the negotiations are limited to a single rail carrier and a single union. They may also bargain on a multi-employer or "national" basis, which means that a group of railroads act jointly in negotiating with one or more unions. National bargaining typically occurs in "rounds" – a new round of national bargaining with all of the unions usually begins every five years.

3. National bargaining – sometimes also called "national handling" – has a long history. The freight railroads have routinely bargained on a multi-employer basis since the early part of the 20th Century, in what are called "major wage and rules movements." The national agreements resulting from this bargaining process do not expire, but rather are modified or supplemented to the extent provided in subsequent agreements. This means that there is not one unitary "collective bargaining agreement" in the railroad industry – rather, there is a long series of agreements stretching back to the 1920s or before. As a result, interpreting those agreements requires an understanding of the sedimentary history of the entire collection. In addition, the national agreements are supplemented by hundreds, if not thousands, of local agreements. There are also an indeterminate number of so-called "implied agreements," based on long-standing and mutually accepted past practice. *See Consolidated Rail Corp. v. RLEA*, 491 U.S. 299, 303-04, 313 (1989) (explaining the concept of implied agreements).

4. Health care is one of the subjects that the freight railroads have typically handled in national bargaining. Health benefits for employees have been collectively bargained on a national basis since at least the 1950s. Such bargaining has resulted, over time, in a number of

so-called "national health and welfare plans," which provide benefits to the unionized employees of the participating carriers.

5.  The Railroad Employees National Health and Welfare Plan (the "National Plan") and the National Railway Carriers and United Transportation Union Health and Welfare Plan (the "NRC/UTU Plan") are collectively bargained national health and welfare plans that provide medical, mental health, and prescription drug benefits for active unionized employees. The NRC/UTU Plan covers employees who work as trainmen, switchmen, brakemen, or conductors and are represented by the United Transportation Union ("UTU") (which recently changed its name to the Transportation Division of the International Association of Sheet Metal, Air, Rail and Transportation Workers). The National Plan covers all of the other unionized crafts, including employees working as locomotive engineers (such as Michael Hall, one of the named plaintiffs in the above-captioned matter). The National Plan has been in existence since the mid-1950s.

6.  The NRC/UTU Plan was split off from the National Plan effective January 1, 2000, at the behest of the UTU, who agreed that the benefits and plan design of the new plan would be substantially the same as those of the National Plan. Substantial uniformity has been maintained ever since, and modifications are generally made in lock-step. Thus, while they are maintained as separate plans pursuant to separate collective bargaining agreements, all of the relevant terms of these two plans, including the terms governing eligible dependents, are essentially the same.

7.  The National Plan Document is attached hereto as Exhibit 1. Pursuant to an amendment dated April 3, 2003, the Plan Document incorporates the Summary Plan Description

("SPD"), which, among other things, describes the benefits provided under the National Plan. A copy of the SPD is attached as Exhibit 2.

8.  The NRC/UTU Plan Document is attached hereto as Exhibit 3. As with the National Plan, the NRC/UTU Plan Document incorporates the NRC/UTU SPD. *See id.* at 14. A copy of the NRC/UTU SPD is attached as Exhibit 4.

9.  As indicated in the Plan Documents and the SPDs, both the National Plan and the NRC/UTU Plan have been established and are maintained pursuant to the national collective bargaining agreements between the carriers and rail labor. *See* Exhibit 1 at 1; Exhibit 2 at 1, 183-84; Exhibit 3 at 1; Exhibit 4 at 1, 176-77. Because the National Plan covers a number of unions, it was established and is maintained pursuant to separate labor agreements with all of the participating unions. An example is the agreement between the NCCC-represented carriers and the Brotherhood of Locomotive Engineers ("BLET"). (BLET is Michael Hall's current representative.) A copy of the most recent NCCC-BLET agreement is attached as Exhibit 5. It states in pertinent part that the National Plan, "modified as provided in this Article . . . will be continued subject to the provisions of the Railway Labor Act." *Id.* at 6. That Agreement also sets forth several material modifications to the Plan agreed to in the last round of national handling. *Id.*

10.  Likewise, the NRC/UTU Plan was established and is maintained pursuant to agreements between the NCCC carriers and the UTU. A copy of the most recent NCCC-UTU agreement is attached as Exhibit 6. It states in pertinent part that the NRC/UTU Plan, "modified as provided in this Article . . . will be continued subject to the provisions of the

Railway Labor Act." *Id.* at 6. Again, it sets forth material modifications to the Plan agreed to in the last round of national handling. *Id.*

11. Changes to the National Plan and NRC/UTU Plan are negotiated between the railroads and the unions in one of two ways. First, changes can be proposed through the formal Section 6 process at the beginning of a round of national handling. *See* 45 U.S.C. § 156. Second, the parties can mutually agree to changes through action by the Joint Plan Committee of the National Plan, or the Governing Committee of the NRC/UTU Plan. Labor and management have equal representation on the Committees, and so action by either Committee requires the concurrence of both labor and management. By acting through the Committees, labor and management are able to bargain, on a voluntary basis, over the various issues that may arise during the interim between rounds of national handling. The results of such bargaining are generally reflected in the series of amendments to each of the two multi-employer plans. *See, e.g.,* Exhibit 1 at 12.

12. In the 1950s, the railroads and the unions engaged in bargaining over health care for employees' dependents. As a result of those negotiations, dependent coverage was added to the National Plan effective December 1, 1956. (As noted above, prior to 2000, there was only one plan.) *See* Exhibit 7 (Agreement Dated November 1, 1956). This was the point at which the parties first introduced the terms "husband" and "wife" with respect to spousal coverage. *Id.* (incorporating terms of Travelers Insurance Company Group Policy No. GA-23111, attached as Exhibit 8). Accordingly, those are collectively-bargained terms. At that time, of course, there was no lawful same-sex marriage. Thus, the common understanding of the terms, on the part of both labor and management, was that they meant only opposite-sex spouses. More specifically,

"wife" meant a woman married to a male employee, and "husband" meant a man married to a female employee.

13.  This mutual understanding of the terms "wife" and "husband" in the dependent coverage provisions of the National Plan was applied consistently for more than 50 years. This consistent past practice gave rise to an implied agreement between the parties that dependent spouse coverage was limited to opposite-sex spouses.

14.  In 2008, questions arose about the meaning of the plan terms as a result of legislation in California and Massachusetts to permit same-sex marriage. The railroad members of the Joint Plan and Governing Committees reviewed the original intent and history of the plan terms, and concluded that the National Plan and NRC/UTU Plan should continue to be interpreted to cover only opposite-gender spouses. The union members of the Committees did not object to or otherwise challenge that interpretation.

15.  The NCCC's interpretation of the relevant terms in 2008 was also supported by then-extant federal law. The Defense of Marriage Act provided that for purposes of interpreting federal law, "the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife." 1 U.S.C. § 7. The railroads understood that an interpretation contrary to federal law could create additional administrative burdens and costs, and could, at least in theory, jeopardize each Plan's status as a VEBA under IRC § 501(c)(9). For these reasons, in combination with the long history of the Plans, the railroads believed that their interpretation of the dependent coverage provisions was (and still is) well-justified.

16. The railroads continued to apply the same interpretation of dependent coverage until the latter half of 2013, again without objection by the unions. Following the Supreme Court's decision in *U.S. v. Windsor* in late June 2013, the railroads decided to take another look at the issue. I subsequently received a letter, dated September 18, 2013, from the labor members of the Joint Plan Committee of the National Plan. A copy is attached as Exhibit 9. In that letter, the labor members noted that they were "not aware of any current regulation or legal ruling that would require the [National Plan] to provide spousal benefits to same-sex married couples." *Id.* at 1. Nevertheless, the labor members asked the railroads to agree to expand coverage. *Id.* I responded by letter dated October 3, 2013, and agreed to bargain with the unions over the issue. *See* Exhibit 10.

17. As a result of those negotiations, the Joint Plan Committee and the Governing Committee agreed to expand dependent coverage to lawful same-sex spouses effective January 1, 2014. We reached agreement on this issue in late October, 2013, and announced it on or about December 4, 2013. A Summary of Material Modification was distributed to affected employees on or about December 23, 2013. A copy is attached as Exhibit 11.

18. Copies of the formal amendments to the NRC/UTU Plan and the National Plan are attached as Exhibits 12 and 13.

19. Under the Railway Labor Act, the railroads are required to bargain with the designated representatives of their employees over changes to dependent health care benefits. 45 U.S.C. § 156. Under the terms of the Plans, such changes may be made only with the concurrence of the labor members of the Committees. Accordingly, now that the changes reflected in the attached amendments have been implemented, same-sex spousal coverage cannot

7

be unilaterally rescinded, limited, or otherwise altered by the railroad participants in the Plans. *See* 45 U.S.C. § 152 Seventh.

Pursuant to 28 U.S.C.§ 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____<br>A. Kenneth Gradia

April 23, 2014